**WESTERLY THEATRE OPERATING CO.,
Inc., v. POUZZNER et al.**

No. 4236.

Circuit Court of Appeals. First Circuit.
July 17, 1947.

S. Everett Wilkins, of Providence, R. I. (Edward M. Watson and Hinckley, Allen, Tillinghast & Wheeler, all of Providence, R. I., on the brief), for appellant.

Edward Winsor, of Providence, R. I. (Gerald W. Harrington, and Edwards & Angell, all of Providence, R. I., and Harry Bergson, of Boston, Mass., on the brief), for appellees.

Before CLARK (by special assignment), MAHONEY and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

This is an appeal from a judgment entered in favor of plaintiffs-appellees. Jurisdiction was based on diversity of citizenship and the sum in controversy exceeded $3,000 exclusive of interest and costs.

Plaintiffs-appellees own and control 50 percent of the outstanding common stock, the sole class of stock of the Westerly Theatre Operating Company, Inc. Morris Pouzzner, the principal plaintiff, and his nominee, Oakley A. Kunz, are officers and directors of the corporation. John B. Findlay, an individual defendant, owns or controls the remaining 50 per cent of the common stock of the corporation. He is president and resident manager of the corporation and he and Henry Harris, his nominee, comprise the remainder of the board of directors. The business of the Westerly Theatre Operating Company consists in the operation of theatres in and about Westerly, Rhode Island, and at the time of the filing of this action the company operated the United Theatre and the Central Theatre and had previously operated the Lyric Theatre, all in the general neighborhood of Westerly. This business had on the whole been conducted on a profitable basis.

Prior to the formation of the Westerly Theatre Operating Company on June 22, 1928, Findlay held the lease on the Lyric Theatre and was also the assignee of a lease on the United Theatre. Findlay likewise owned the fixtures in both theatres and had operated these theatres prior to the incorporation of the Operating Co. The Central Theatre was owned and operated by one John L. Weyet in competition with the Lyric Theatre. Findlay and Weyet in 1928 decided to form a corporation to control and operate all three theatres and both agreed to lease or sublease to the corporation the theatres that each controlled. The Central Theatre was conveyed to the Westerly Central Theatre Realty Co., which Pouzzner subsequently controlled, and by it leased to the Operating Company for a term of 17 years and 7 months commencing June 1, 1928. Pouzzner then acquired Weyet's stock in the Operating Company and thereafter Weyet dropped out of the picture. Findlay on June 30, 1928 subleased to the Operating Company the United Theatre for the same term as the lease of the Central Theatre and also subleased the Lyric Theatre for a term of 11 months from June 1, 1928. These leases and subleases were the shareholder's contributions to the corporation and constituted the chief if not the only assets of the corporation.

The Central Theatre lease forms no part of the present controversy and hence does not merit further discussion. With respect to the other leases the district court made detailed findings of fact substantially not in dispute which will not be here repeated but are reported in 67 F.Supp. 874. The following facts are necessary to an understanding of the matter in controversy.

The sublease of the United Theatre which was to run for 17 years and 7 months, the remaining term of the original lease (with its renewal options) which had been assigned to Findlay, provided for an increasing scale of rents some $1,500 to $1,800 annually less than the rent provided for in the original lease. This difference the district court attributed to the fact that two stores located in the theatre building which were included in the original lease were not part of the sublease, and the court concluded that the rent collected by Findlay on these two stores accounted for the difference in rent. About two years before the renewed lease and the sublease on the United Theatre were to terminate, Pouzzner raised the question of obtaining a new lease and Findlay agreed to contact the lessor to ascertain the type of a lease he would require and also to hold, if possible, the rents to their present level. At a shareholders' meeting a year later in January, 1944 Findlay reported that he had con-

tacted the lessor regarding a new lease on the United Theatre and that the lessor was willing to execute a new lease but at an increased rental. Findlay was requested to renew negotiations in an effort to secure more reasonable rent. The minutes of the February 8, 1945 shareholders' meeting indicate that Findlay reported that he had negotiated a new lease on the United Theatre which was in his name, but at a higher rental than in the original lease. Pouzzner and Findlay were thereupon appointed a committee to negotiate for new leases on the Central and United Theatres for the benefit of the company. Because other matters in dispute between Findlay and Pouzzner were not settled to the satisfaction of Findlay, he refused to execute a sublease of the United Theatre to the Operating Company but instead he organized the United Theatres Company and subleased the United Theatre to that new corporation for a rental substantially in excess of the previous rent and also in excess of the rent to be paid by him to his lessor. It was the contention of the Pouzzner interests below that Findlay held this United Theatre lease for the benefit of the Operating Company and that his refusal to execute a sublease to that company and his execution of a sublease to the new corporation constituted violations of a fiduciary duty owing to the Operating Company. With this contention the district court concurred. Its opinion and findings of fact indicate that the court below found that in negotiating for the acquisition of the new United Theatre lease Findlay was acting on behalf of the corporation as its representative or agent and not in his individual capacity as an assignee-lessee. Because Findlay was acting in a fiduciary capacity in negotiating this new lease the district court concluded that he was a trustee for the Operating Company of the theatre portion of the United Theatre lease and, accordingly, Findlay and his United Theatres Company were ordered to cancel the sublease to that company, Findlay was ordered to tender a sublease of the United Theatre to the Operating Company in the same form as the original 1928 sublease with necessary modifications as to rent and terms, the Westerly Central Theatre Realty Company was ordered to tender a similar lease of the Central Theatre, and the Westerly Theatre Operating Company was ordered to accept such leases. With respect to this portion of the controversy defendants argue that the court erred in finding Findlay to be trustee for the Operating Company of the United Theatre lease. They urge that since Findlay was a lessee in his individual capacity he had a right to take a new lease in his own name and that he was under no duty to execute a sublease to the Operating Company. They further argue that the court committed error by excluding testimony of the original lessor to the effect that he would have refused to execute a lease directly to the Operating Company.

The other issue in this controversy relates to the Lyric Theatre sublease. Findlay's original lease on this property called for a term of two years commencing May 1, 1927 at $175 per month with an option for renewal for 3 years at the same rent and a further option for a second 3 year renewal period at $192.50 per month. On June 30, 1928 Findlay subleased this Lyric Theatre to the Operating Company for the balance of the two year term at $175 per month and included in the sublease the same renewal options as in his original lease. Defendant's Exhibit A, which is the agreement between Findlay and Weyet in which they mutually agreed to form the Operating Company and to lease their respective theatres, refers to Findlay's agreement to lease to that corporation the Lyric Theatre for the balance of the term of the original lease "under the same terms and for the same rental therein provided for." In 1932 the Lyric Theatre was closed although the lease and sublease arrangement was continued until 1944 in order to eliminate possible competition. Over the period from 1932 to 1944 Findlay managed to have his rent reduced by his lessor but continued to collect $192.50 from the Operating Company. The total discrepancy between the rents paid by Findlay and those collected by him from his sublessee amounted to $9,240. Findlay's contract under which he was employed by the Operating Company as resident manager of the three theatres provided that: "Said Manager is to have

charge and control under the direction of the General Manager [Pouzzner] of said three theatres, and he agrees to serve said company with his utmost skill, diligence, ability and loyalty in the discharge of his duties."

The court below found that Findlay did not live up to the terms of this contract, that he did not disclose to the Operating Company that he had received a reduction in rent on the Lyric Theatre from his lessor and that during one period he collected his rent from the corporation although he was not then obliged to pay any rent to his lessor. The Court likewise found that " 'it was suggested a few times at meetings' that he try to procure a lower rent." There is also another item of rent that Findlay collected from a tenant of the theatre lobby which he neglected to turn over to the Operating Company but no dispute concerning this now exists since liability therefor is now admitted. The district court held that Findlay was liable to the Operating Company for these secret profits on the Lyric Theatre sublease and, accordingly, he was ordered to pay to the Operating Company such amounts with interest. The appellants argue that the court below erred in finding Findlay accountable to the Operating Company for the secret profits made by him on the Lyric Theatre sublease. They assert that this lease being Findlay's individual property prior to the existence of the corporation he could lease to the corporation or not as he wished, and if the corporation took the benefit of the lease it was obliged to pay the rental agreed upon even though it meant a profit to an officer-director of the corporation.

■■ The general rules applicable to the United Theatre situation are not seriously in dispute and are stated succinctly in 3 Fletcher, Cyclopedia of the Law of Private Corporations (1931). At § 861 it is stated: " * * * that a director or other corporate officer cannot acquire an interest adverse to that of the corporation, while acting for the corporation or when dealing individually with third persons, and if he acquires an interest in an estate in which the corporation already has an existing interest, or where he acquires an interest outside, which the corporation had contemplated and desired acquiring, by overreaching the corporation, or taking advantage of knowledge which he has as an officer of it, such acquisition will be taken for the benefit of the corporation. * * * If it is the duty of officers in a particular case to enter into a contract, or to purchase or take a transfer of property on behalf of the corporation, and, in violation of this duty, they enter into the contract or acquire the property personally, they will not be permitted to retain the benefit, but will be held as trustees for the corporation."

And at § 862: "The test seems to be whether there was a specific duty, on the part of the officer sought to be held liable, to act or contract in regard to the particular matter as the representative of the corporation—all of which is largely a question of fact."

■■ More particularly in reference to the specific problem here presented, the court below cited cases wherein a director or officer in violation of a fiduciary duty renewed a corporate lease in his own name and he was held to be a trustee of such a renewed lease for the benefit of the corporation. See McCourt v. Singers-Bigger, 8 Cir., 1906, 145 F. 103, 7 Ann.Cas. 287; Paw Paw Savings Bank v. Free, 1919, 205 Mich. 52, 171 N.W. 464; Acker, Merrall & Condit Co. v. McGaw, 1907, 106 Md. 536, 68 A. 17; Robinson v. Jewett, 1889, 116 N.Y. 40, 22 N.E. 224. Appellants seek to distinguish those cases and thereby have the rule rendered inapplicable to Findlay by pointing out that in those cases the corporation held the expectancy of renewal by virtue of being either the original lessee or assignee of the lease whereas in the instant case Findlay was the assignee and therefore had the expectancy of renewal. But we think that regardless of Findlay's expectancy of renewal it cannot be doubted that the Operating Company was at least interested in the lease and desirous of re-acquiring its benefit. We believe that this case turns on the question whether Findlay regardless of his own expectancy of renewal was under a duty to take a new lease in the name of the corporation or in his own name as an agent of the corporation. And, as stated by Fletcher, the existence of such a duty is largely a question of fact. If

Findlay was delegated by the corporation to negotiate for a new lease for the corporation (and the district court so found) and he wished to preserve his own interest in the lease he should have disclosed his intentions and permitted the corporation to act otherwise in its own interests. See Pikes Peak Co. v. Pfuntner, 1909, 158 Mich. 412, 416, 123 N.W. 19, 21. The district court's finding that Findlay owed such a duty to the corporation seems amply warranted by the evidence, and we see no reason to disturb such a decision. Moreover, the existence of a duty to act for the corporation may also be predicated on Findlay's relationship to the corporation as director, officer and resident manager. Were he desirous of taking this lease for his own individual interest and not again to sublease to the Operating Company, it was his duty to sever his relationship with the corporation and not divert to his own favor interests which properly belonged to the corporation.

While it is true that a director may acquire what would otherwise be an interest adverse to the corporation where the other party to the transaction refused to deal with the corporation (See 3, Fletcher, supra, at § 862), we feel that any error committed by the district court in excluding the proffered testimony of Findlay's lessor was harmless error. Findlay never informed the corporation of the lessor's attitude prior to taking the lease, and no other evidence exists that the lessor would have refused a lease to the corporation except the lessor's somewhat self-serving statement first suggested at the trial. Had Findlay made a full disclosure of all the facts to the corporation, as was required by his duty to act in utmost good faith and fairness as an officer-director, it could have taken steps to improve its standing if necessary in the eyes of the lessor. Moreover, since it was open to Findlay to take this lease in his own name as agent for the corporation, we deem it immaterial that the lessor might have refused a lease to the corporation directly.

A similar analysis applies to that aspect of the instant case which is concerned with Findlay's profits on the Lyric Theatre lease. Fletcher states the rule at § 885 that: "The doctrine that a director or other officer of a corporation cannot obtain a profit or advantage in dealings on behalf of the corporation only applies where the officer is acting for the corporation, or for some other reason owes a duty to the corporation which is inconsistent with his obtaining the profit or advantage."

Appellants on the other hand point to the fact that Findlay, as original lessee, was free to deal with this property as he wished prior to the formation of the Operating Company; and that, since he had not acquired the lease while purporting to act for the corporation or intending to take it for purposes of transfer to the corporation at a profit, after the formation of the corporation, he was free to deal with his corporation at a profit as with any other third party subject only to the corporation's right to rescind if the price were excessive. See Harris v. United Service Co., 1930, 182 Ark. 779, 32 S.W.2d 618; Bliss Petroleum Co. v. McNally, 1931, 254 Mich. 569, 237 N.W. 53; New York Trust Co. v. American Realty Co., 1926, 244 N.Y. 209, 155 N.E. 102. But this argument is inapplicable here since Findlay had already agreed to execute a sublease to the Operating Company "under the same terms and for the same rental therein" and such a lease had been executed.

The real question then is not whether Findlay could have leased the Lyric Theatre to the Operating Company at a profit but whether having executed a lease for the same rent and terms as the original lease, he was obliged to pass on to his sublessee any rent reductions he subsequently obtained as original lessee. As in the first issue, the answer turns on the existence of a duty on the part of Findlay to negotiate for the corporation a reduction in its rental obligations and this is again a question of fact. The district court found that such a duty did exist basing its conclusion on the terms of Findlay's resident manager's contract and the requests made of Findlay at stockholders' meetings that he endeavor to procure a lower rental, as well as the lack of full disclosure of the facts which Fletcher, at § 887, calls an essential element of this type of liability. Moreover, as an officer and director Findlay by taking this

profit to his own advantage was not fulfilling his duties of fidelity, fairness and frankness that he owed to his corporation. The personal advantage he derived from these profits would undoubtedly influence his judgment as an officer and director in recommending the continuation of the sublease after the theatre was no longer operating. For all these reasons the appeal is without merit.

The judgment of the District Court is affirmed.